23CA1192 Peo v Douglas 01-29-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1192
City and County of Denver District Court No. 15CR6591
Honorable Brian R. Whitney, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kiki Lamount Douglas,

Defendant-Appellant.

---

ORDER REVERSED AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Schutz, J., concurs
Harris, J., specially concurs

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 29, 2026

---

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Kiki Lamount Douglas, appeals the district court's order rejecting his constitutional challenge to his habitual criminal sentences. Because we conclude that an abbreviated proportionality review of Douglas's sentences raises an inference of gross disproportionality, we reverse the order and remand the case for the court to conduct an extended proportionality review.

## I. Background

¶ 2 A jury found Douglas guilty of class 2 felony attempted first degree murder – after deliberation, *see* § 18-3-102(1)(a), (3), C.R.S. 2025; § 18-2-101(4), C.R.S. 2025; two related crime of violence counts, *see* § 18-1.3-406(2)(a)(I), (II)(B), C.R.S. 2025; and class 3 felony first degree assault – causing serious bodily injury with a deadly weapon, *see* § 18-3-202(1)(a), (2)(b), C.R.S. 2025. The district court later adjudicated Douglas a habitual criminal, finding that the prosecution proved that Douglas had five prior felony convictions: three instances of possession of a controlled substance, attempted escape, and accessory to a crime.

¶ 3 At the sentencing hearing, the district court conducted a proportionality review of the habitual criminal sentences and determined that they were not grossly disproportionate. The court

then sentenced Douglas to ninety-six years in the custody of the Department of Corrections (DOC) on the attempted murder charge and to a concurrent sixty-four years on the assault charge. A division of this court affirmed the judgment of conviction, the habitual criminal adjudication, and the sentence, but it remanded "[t]he case . . . for the district court to conduct a new proportionality review under [recently announced Colorado Supreme Court opinions]." *People v. Douglas*, slip op. at ¶ 48 (Colo. App. No. 17CA0613, Dec. 26, 2019) (not published pursuant to C.A.R. 35(e)) (*Douglas I*).

¶ 4    On remand, Douglas filed a pro se motion for the court to conduct the proportionality review. Among other things, he asked that the court's review consider relevant legislative amendments.

¶ 5    The district court denied Douglas's pro se motion without a hearing or the appointment of counsel. In reviewing the proportionality of the sentences, the court first considered the gravity or seriousness of Douglas's attempted first degree murder and first degree assault convictions (triggering offenses) and his prior convictions (predicate offenses). The court determined that two of Douglas's prior drug possession convictions were not grave

2

and serious because they involved less than four grams of a controlled substance and because relevant legislative amendments enacted after the convictions lowered the applicable penalties and precluded those convictions from being used as predicate offenses for habitual criminal purposes. But the court found that Douglas's triggering offenses and his three remaining predicate offenses were grave and serious.

¶ 6    As relevant here, the district court determined that Douglas's other prior drug conviction was grave and serious because he possessed 7.3 grams of cocaine. The court stated that this large amount of narcotics represented an intent to distribute the controlled substance and noted that the legislature's reduction in the consequences related to drug convictions did not include convictions for possession of more than four grams of a controlled substance.

¶ 7    The district court further found that Douglas's accessory to crime conviction was grave and serious because (1) Douglas was the passenger of a car that fled the scene of a drug transaction; (2) during the flight, the car struck another vehicle and caused the death of the other vehicle's driver; (3) Douglas purportedly did not

3

assist the gravely injured party; and (4) Douglas provided incorrect information to the police. The court determined that "providing false information, participating in a drug transaction, and failing to aid a dying individual after being the passenger in the car that hit the individual[] are all actions that pose a significant danger and harm to society."

¶ 8 Lastly, the district court considered, but rejected, Douglas's assertion that amendments to the habitual criminal statute precluded the use of his attempted escape conviction as a predicate offense. The court found that the conviction was grave and serious because of "the potential danger of having a convicted felon escape detainment and harm society prior to fully serving his time" and because "[t]he attempted escape shows a disrespect, and disregard of the justice system, and a lack of remorse and willingness to change."

¶ 9 After making these findings, the district court then determined that a comparison of the gravity and seriousness of the triggering and predicate offenses to the harshness of Douglas's parole-eligible habitual criminal sentences did not give rise to an inference of gross disproportionality.

4

## II. Legal Authority and Standard of Review

¶ 10    The habitual criminal statute, when applicable, strips a district court of its discretion in sentencing. *Wells-Yates v. People*, 2019 CO 90M, ¶ 20. As relevant here, a defendant convicted of a felony who has been previously convicted of three felonies shall be adjudicated a habitual criminal, and the court shall impose a prison sentence for a term of four times the maximum of the presumptive sentencing range for the class of felony of which the person was convicted. § 18-1.3-801(2)(a)(I)(A), C.R.S. 2025.

¶ 11    "But the legislature's authority to prescribe harsher punishment for habitual criminals is not without constitutional contours. It is limited by the principle of proportionality that is embedded in the constitutional prohibition against the infliction of cruel and unusual punishment." *Wells-Yates*, ¶ 1.

¶ 12    The Eighth Amendment to the United States Constitution prohibits the imposition of a sentence that is grossly disproportionate to the severity of the crime committed. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *Wells-Yates*, ¶ 5. The Amendment "does not require strict proportionality between crime

5

and sentence." *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in the judgment). Rather, it forbids only extreme sentences that are grossly disproportionate to the crime. *Close v. People*, 48 P.3d 528, 536 (Colo. 2002), *abrogated on other grounds by, Wells-Yates*, ¶¶ 16-17.

¶ 13    Review of the constitutional proportionality of a sentence involves a two-step process: an abbreviated proportionality review and, if needed, an extended proportionality review. *Wells-Yates*, ¶¶ 7, 10. "If there are multiple triggering offenses, the reviewing court must look at the sentence imposed for each such offense and engage in a proportionality review of that sentence because each sentence represents a separate punishment for a distinct and separate crime." *Id.* at ¶ 24.

¶ 14    An abbreviated proportionality review involves a comparison of two subparts, the gravity or seriousness of the offense and the harshness of the penalty, to determine whether an inference of gross disproportionality exists. *Id.* at ¶¶ 7-9, 11, 14, 23. When the proportionality of a habitual criminal sentence is challenged, "[t]he court must scrutinize the triggering offense and the predicate offenses and determine whether in combination they are so lacking

in gravity or seriousness so as to suggest that the sentence is unconstitutionally disproportionate to the crime, taking into account the defendant's eligibility for parole."  *Id.* at ¶ 23.

¶ 15 Ordinarily, the determination of whether a crime is grave or serious depends on the facts and circumstances underlying the offense.  *People v. Duran*, 2025 COA 34, ¶ 29; *People v. Hargrove*, 2013 COA 165, ¶ 12*, abrogated on other grounds by, Wells-Yates*, ¶¶ 16-17.  Specifically,

> [t]o determine the gravity or seriousness of an offense, courts may consider a number of factors, including but not limited to (1) "the harm caused or threatened to the victim or society"; (2) whether the offense involved violence or the threat of violence; (3) "[t]he absolute magnitude of the crime"; (4) whether the offense is the lesser included or greater offense; (5) whether the offense was an attempted or a completed crime; (6) whether the defendant was an accessory, complicitor, or principal; and (7) the defendant's culpability and motive.

*McDonald v. People*, 2024 CO 75, ¶ 12 (quoting *Solem v. Helm*, 463 U.S. 277, 292-94 (1983)).  Also, "[i]n determining the gravity or seriousness of [an] offense during an abbreviated proportionality review, the trial court should consider relevant legislative

amendments enacted after the date of the offense, even if the amendments do not apply retroactively." *Wells-Yates*, ¶ 45.

¶ 16    Some crimes, however, have been designated as inherently, or "per se," grave or serious for purposes of a proportionality review. *Id.* at ¶ 13. A per se grave and serious designation is reserved for those crimes that, based on their statutory elements, necessarily involve grave and serious conduct. *Id.* at ¶ 63. In other words, per se grave and serious offenses "are always grave and serious regardless of the underlying facts of the conviction." *People v. Tran*, 2020 COA 99, ¶ 79. "For these crimes, . . . a trial court may skip the first subpart of step one — the determination regarding the gravity or seriousness of the crimes — and 'proceed directly to the second subpart' of that step — the assessment related to the harshness of the penalty." *Wells-Yates*, ¶ 13 (quoting *Close*, 48 P.3d at 538).

¶ 17    When considering the harshness of the penalty, "a great deal of deference is due to legislative determinations regarding sentencing." *People v. Deroulet*, 48 P.3d 520, 523 (Colo. 2002), *abrogated on other grounds by, Wells-Yates*, ¶¶ 16-17. Accordingly, "in almost every case, the abbreviated proportionality review will

result in a finding that the sentence is constitutionally proportionate, thereby preserving the primacy of the General Assembly in crafting sentencing schemes." *Id.* at 526.

¶ 18    If an abbreviated proportionality review reveals no inference of gross disproportionality, no further analysis is required. *Wells-Yates*, ¶ 15; *Close*, 48 P.3d at 542. The court should proceed to the extended proportionality review only when the comparison between the gravity and seriousness of the offense and the harshness of the penalty gives rise to an inference of gross disproportionality. *Duran*, ¶ 28; *People v. Strock*, 252 P.3d 1148, 1157 (Colo. App. 2010), *overruled by*, *People v. Kennedy*, 2025 CO 63.

¶ 19    Whether a sentence is grossly disproportionate is a question of law, which we review de novo. *Wells-Yates*, ¶ 35.

¶ 20    The district court's order acknowledged *Douglas I*'s mandate but employed standards applicable to a Crim. P. 35(c) proceeding. *See People v. Moore-El*, 160 P.3d 393, 395-96 (Colo. App. 2007) (a defendant can make a postconviction request for a proportionality review, which is cognizable under Crim. P. 35(c)). Because this is a second appeal after remand from a prior appeal, not a postconviction proceeding, we do not apply Crim. P. 35(c) standards

but rather assess the proportionality review in the procedural context it was considered by the district court on remand.

### III. Habitual Criminal Adjudication

¶ 21 First, we note that, in addition to addressing the proportionality of his habitual criminal sentence, the parties' appellate briefs raise questions about the validity of Douglas's habitual criminal adjudication. Indeed, the People concede that Douglas's prior small-quantity drug possession convictions should not have been used as predicate offenses. *See* § 18-1.3-801(2)(b), C.R.S. 2016; *Thomas v. People*, 2021 CO 84, ¶¶ 59-65. And Douglas maintains that his attempted escape conviction is also not eligible to be used as a predicate offense.

¶ 22 Consequently, we requested supplemental briefing to address whether we could revisit *Douglas I*'s affirmance of Douglas's habitual criminal adjudication and, if so, whether the attempted escape conviction could be used as a predicate offense to adjudicate Douglas a habitual criminal in light of amendments to the habitual criminal statute. In their briefing, the parties disagree on whether we can reconsider the adjudication and whether Douglas may avail himself of the amended language in the habitual criminal statute.

Further, the People assert that we should not address this issue at all because it was not properly raised.

¶ 23    Having considered the parties' original and supplemental briefs, we agree with the People that the validity of the habitual criminal adjudication is not properly at issue in this proceeding.

¶ 24    First, we are reviewing the appeal of an order entered on remand from *Douglas I*.  The habitual criminal adjudication was not within the scope of *Douglas I*'s specific remand language for the district court to conduct a new proportionality review.  *See Musgrave v. Indus. Claim Appeals Off.*, 762 P.2d 686, 687-88 (Colo. App. 1988) ("When an appellate court remands a case with specific directions . . . to pursue a prescribed course, a trial court has no discretion except to comply with such directions"; only when a case is generally remanded for further proceedings consistent with the appellate court's opinion can a court "make new findings and conclusions so long as there is no conflict with the ruling of the appellate court."); *Molinary v. Powell Mountain Coal Co.*, 173 F.3d 920, 923 (4th Cir. 1999) ("On remand, a lower court may decide matters left open only insofar as they reflect proceedings consistent with the appellate court's mandate."); *see also Wells-Yates*, ¶ 48

("Whether statutory revisions apply retroactively 'is a separate and distinct question from whether a defendant's sentence is constitutionally proportionate.'" (quoting *Rutter v. People*, 2015 CO 71, ¶ 35 (Gabriel, J., dissenting))).

¶ 25    Further, the law of the case doctrine renders *Douglas I*'s affirmance of the habitual criminal adjudication binding unless we can say that application of that prior ruling would result in error. *See People v. Robbins*, 87 P.3d 120, 122 (Colo. App. 2003), *aff'd*, 107 P.3d 384 (Colo. 2005); *People v. Dunlap*, 975 P.2d 723, 758 (Colo. 1999).  Douglas did not address the law of the case doctrine or sufficiently demonstrate why *Douglas I*'s ruling was error.  *See People v. Houser*, 2020 COA 128, ¶ 24 (we will not consider a bald legal proposition presented without argument or development).

¶ 26    For those reasons, we decline to address the validity of Douglas's habitual criminal adjudication.

## IV.    Constitutional Proportionality

¶ 27    Accordingly, we turn to the focus of the remanded proceeding — the constitutional proportionality of Douglas's habitual criminal sentences.  We conclude that the district court erred in its consideration of the gravity or seriousness of Douglas's triggering

and predicate convictions during the abbreviated proportionality review.

¶ 28    The version of the habitual criminal statute in effect when Douglas was adjudicated allowed a prior attempted escape conviction to be used as a predicate offense if the defendant attempted to escape from a correctional facility.  *See* § 18-1.3-801(5), C.R.S. 2016.  A correctional facility was defined as "any facility under the supervision of the [DOC] in which persons are or may be lawfully held in custody as a result of conviction of a crime." § 17-1-102(1.7), (2), C.R.S. 2016.  As relevant here, a community corrections facility could fall within the definition of correctional facility.  *See* § 17-27-102(3), C.R.S. 2016.

¶ 29    But the legislature later amended the habitual criminal statute to provide that, "for the purposes of this section, 'correctional facility' does not include a community corrections facility, as defined in section 17-27-102(2.5)[, C.R.S. 2017]." § 18-1.3-801(5), C.R.S. 2017; *see* Ch. 374, sec. 1, § 18-1.3-801(5), 2017 Colo. Sess. Laws 1937.  In their supplemental briefs, the parties agree that Douglas's prior conviction was based on an attempted escape from

a community corrections facility. *See Lawson v. Zavaras*, 966 P.2d 581, 582-83, 586 (Colo. 1998).

¶ 30     The district court erred in its gravity or seriousness determination by (1) incorrectly finding that the amendment to the habitual criminal statute did not implicate the use of Douglas's attempted escape conviction as a predicate offense; and (2) thus not considering the effect of the amended habitual criminal statute, if it applied, on the use of Douglas's attempted escape conviction as a predicate offense. Because the considerations necessary to conduct the abbreviated proportionality review in this case are largely questions of law, we turn to that issue. *See People v. Gaskins*, 825 P.2d 30, 37-38 (Colo. 1992) ("In the absence of a need for a refined analysis inquiring into the details of the specific offenses or a detailed comparison of sentences imposed for other crimes in this or other jurisdictions, an appellate court is as well positioned as a trial court to conduct a proportionality review."), *abrogated on other grounds by, Wells-Yates*, ¶¶ 55-56, 66; *People v. Castillo*, 2022 COA 20, ¶ 38.

¶ 31     First, we conclude that Douglas's triggering convictions (attempted first degree murder – after deliberation and first degree

assault – causing serious bodily injury by means of a deadly weapon) are per se grave and serious offenses. *See Wells-Yates*, ¶¶ 65, 71 (accessory to first degree murder is a per se grave and serious offense because its statutory elements ensure that the defendant will have committed a crime that is necessarily grave or serious); *Castillo*, ¶ 42 (the defendant's first degree extreme indifference murder conviction under a complicity theory was a per se grave and serious offense); *see also People v. Lopez*, 2025 COA 73, ¶¶ 1, 13-15 (first degree assault – causing serious bodily injury with a deadly weapon is a per se grave and serious offense); *Duran*, ¶¶ 3, 33-36 (extreme indifference first degree assault is per se grave and serious).

¶ 32    However, we are not convinced that Douglas's predicate offenses, individually or viewed together, are necessarily grave or serious. As the district court found, two of Douglas's drug possession convictions were not grave and serious due to the small quantities of controlled substances involved in each matter and the convictions' ineligibility for use as predicate offenses. For the reasons set forth above, Douglas's conviction for attempted escape

from a community corrections facility would no longer qualify for use as a predicate offense.

¶ 33    With regard to the accessory to a crime conviction, we recognize the gravity and seriousness of the fatal motor vehicle accident that occurred.  But the record indicates that Douglas's culpability in the incident was as a nonviolent accessory to the driver's criminal actions.  *See McDonald*, ¶ 12.  And we are unaware of any record support for the district court's findings that Douglas was in the vehicle at the time of the fatal accident and that he purportedly refused to provide aid to the injured party.

¶ 34    In any event, the second subpart of the abbreviated proportionality review — consideration of the harshness of the sentence imposed on each triggering conviction — is concerning.  *See Wells-Yates*, ¶ 13.

¶ 35    The jury's guilty finding on the attempted first degree murder count and the two related crime of violence counts would have subjected Douglas to an aggravated sentencing range of sixteen to forty-eight years in the DOC.  *See* § 18-1.3-401(1)(a)(V)(A), (8)(a)(I), C.R.S. 2025; § 18-1.3-406(1)(a); *People v. Villarreal*, 131 P.3d 1119, 1129 (Colo. App. 2005).  And the jury's guilty finding on the first

degree assault count, which is a per se crime of violence and an extraordinary risk crime, would have subjected Douglas to an aggravated sentencing range of ten to thirty-two years in the DOC. *See* § 18-3-202(2)(c); § 18-1.3-401(10)(a), (b)(XII); *People v. Palmer*, 2018 COA 38, ¶ 18. Recognizing the seriousness of these offenses, the court's initial sentences on each of these two counts were at the top of the aggravated sentencing ranges — forty-eight and thirty-two years. But, because Douglas was adjudicated a habitual criminal, the district court was stripped of its discretion to impose a sentence within the aggravated ranges and was instead required to impose habitual criminal sentences that were double the aggravated sentences. *See* § 18-1.3-801(2)(a)(I)(A), C.R.S. 2016; *People v. Lahr*, 2013 COA 57, ¶¶ 28, 34-35, 39.

¶ 36     We recognize that, "[o]nce a crime has been deemed per se grave or serious, . . . any review in the second subpart [of the abbreviated proportionality review] is substantially circumscribed because the legislature's establishment of the harshness of the penalty deserves great deference." *Wells-Yates*, ¶ 62. But, "when the General Assembly subsequently amends a criminal sentencing statute, even though the statute is to be applied prospectively, the

17

trial court may properly consider it when determining whether a defendant's sentence was grossly disproportionate." *People v. Anaya*, 894 P.2d 28, 32 (Colo. App. 1994); *see also Wells-Yates*, ¶¶ 44-45 (favorably citing *Anaya* for this proposition).

¶ 37    Here, after Douglas's habitual criminal adjudication, the legislature amended the habitual criminal statute to narrow the type of attempted escape conviction that could be used as a predicate offense to subject a defendant to mandatory habitual criminal sentencing. Considering the effect of this amendment, as well as the habitual criminal statute's provision regarding the use of the small-quantity drug possession convictions, three of Douglas's five prior convictions would not have been eligible for use as predicate offenses, and, accordingly, he would not have been adjudicated a habitual criminal. And the court would have thus retained the discretion to impose sentences within ranges that could have resulted in prison terms as low as sixteen years and ten years. *See People v. Penrod*, 892 P.2d 383, 387-88 (Colo. App. 1994) (legislative amendments to the habitual criminal statute that significantly reduced a defendant's sentencing exposure should be considered when reviewing for constitutional proportionality).

18

¶ 38 Thus, considering the effect the legislative amendments would have had on the district court's discretion in sentencing Douglas, we conclude that a comparison of Douglas's predicate convictions and his triggering attempted first degree murder conviction — in combination — to the harshness of his mandatory ninety-six-year habitual criminal sentence raises an inference of gross disproportionality. And we similarly conclude that a comparison of Douglas's predicate convictions and his triggering first degree assault conviction — in combination — to the harshness of his sixty-four-year habitual criminal sentence also raises an inference of gross disproportionality. Accordingly, a remand of the case is necessary for the district court to conduct an extended proportionality review.

## V. Disposition

¶ 39 The order is reversed, and the case is remanded for further proceedings consistent with this opinion.

JUDGE SCHUTZ concurs.

JUDGE HARRIS specially concurs.

JUDGE HARRIS, specially concurring.

¶ 40    I agree with the majority's thoughtful and thorough opinion, as far as it goes — that the habitual criminal sentence imposed on defendant, Kiki L. Douglas, raises an inference of gross disproportionality.  But I write separately because I do not think the opinion goes far enough.

¶ 41    The majority acknowledges that this is the second appeal of Douglas's judgment of conviction, *see People v. Douglas*, (Colo. App. No. 17CA0613, Dec. 26, 2019) (not published pursuant to C.A.R. 35(e)) (*Douglas I*); during the pendency of the first appeal, an August 2017 amendment to the habitual criminal sentencing statute "narrow[ed] the type of attempted escape conviction that could be used as a predicate offense"; and, if the amendment had been applied in the prior appeal or on remand, Douglas "would not have been adjudicated a habitual criminal." *Supra* ¶ 37.  Nonetheless, the majority declines to review the validity of Douglas's habitual criminal adjudication.

¶ 42    Because "ameliorative, amendatory legislation applies retroactively to non-final convictions" unless the amendment expressly provides otherwise, *People v. Stellabotte*, 2018 CO 66,

¶ 38, the August 2017 amendment unequivocally applies, meaning Douglas is not a habitual criminal. Accordingly, I would reverse the district court's order and remand the case for resentencing under the general sentencing statutes.

## I. The Gravity and Seriousness of Douglas's Predicate Offenses

¶ 43 I turn first to the common ground. Like the majority, I conclude that Douglas's predicate offenses are so lacking in gravity and seriousness that they cannot support the habitual criminal sentence, at least not without further review.

¶ 44 No one disputes that Douglas's triggering offenses — attempted murder and first degree assault, which involved him shooting the victim five times at close range — are grave and serious violent crimes. As punishment, the legislature has mandated substantial prison time: sixteen to forty-eight years (twice the presumptive maximum) for attempted murder, § 18-1.3-401(1)(a)(V), C.R.S. 2025; § 18-1.3-406(1)(a), (2)(a)(I)-(II); § 18-2-101(3.5), C.R.S. 2025; and ten to thirty-two years (twice the presumptive maximum for an extraordinary risk crime) for first degree assault, § 18-1.3-401(1)(a)(V); § 18-1.3-406(1)(a), (2)(a)(I)-(II);

21

18-1.3-401(10)(a), C.R.S. 2025. But upon a finding that Douglas had three qualifying prior felony convictions, the court was required to quadruple the presumptive maximum sentence for each offense, resulting in a mandatory controlling term of ninety-six years in prison. *See* § 18-1.3-801(2)(a)(I)(A), C.R.S. 2025.

¶ 45 Before this case, Douglas had never been convicted of a violent felony or sentenced to more than three years in prison. As the majority notes, he had prior convictions for possession of cocaine, two involving less than four grams and a third allegedly involving around seven grams; accessory to a crime; and attempted escape. All but the accessory conviction were more than ten years old at the time Douglas committed the underlying offenses in this case.

¶ 46 Everyone now agrees that Douglas's two low-level drug convictions could not be used to adjudicate him a habitual criminal, *see Thomas v. People*, 2021 CO 84, ¶ 63 (Drug felonies involving less than four grams of cocaine "qualify as neither triggering offenses nor predicate offenses for habitual criminal purposes."), despite the prior division's contrary conclusion, *see Douglas I*, slip op. at ¶¶ 42-43.

¶ 47   That leaves three potential qualifying prior convictions — the 2003 conviction for possession of seven grams of crack cocaine, the 2014 conviction for accessory to a crime, and the 2004 attempted escape conviction.

¶ 48   As an initial matter, I agree with the majority that the district court erred in its characterization of Douglas's predicate offenses as grave and serious.[1]

### A.   Possession of a Controlled Substance Conviction

¶ 49   In March 2003, Douglas was stopped in north Denver for "no license plate light." After officers saw Douglas reach into the front of his pants, they searched him and found a baggie of suspected crack cocaine. Officers issued Douglas a summons charging him with possession of a controlled substance. Later, the prosecution filed a complaint and information (Case No. 03CR1485) that included an additional charge of possession with intent to distribute the controlled substance. The presentence investigation report (PSI)

---

[1] The Attorney General acknowledges that we are in as good a position as the district court to review the documentary evidence and determine the gravity and seriousness of the predicate offenses. *See, e.g., People v. Ramadon*, 2013 CO 68, ¶ 21; *see also People v. Wells-Yates*, 2023 COA 120, ¶ 17 (appellate court reviews the district court's gravity and seriousness findings de novo).

23

prepared in 2016 in connection with the attempted murder case indicates that the substance in the baggie ultimately tested positive for "cocaine base in the amount of 7.30 grams."

¶ 50 Douglas pleaded guilty to possession of a controlled substance, and the prosecution dismissed the possession with intent to distribute charge. The record does not contain the plea agreement, and the court's form order concerning the plea states only that "there is a factual basis for (1) the charge(s) to which the Defendant has pled guilty or; (2) the defendant knowingly waives a factual basis for the lesser charge(s) to which he/she has actually pled guilty." In other words, nothing in the record shows that, as part of the plea proceedings, the prosecution established, or Douglas admitted, that he possessed 7.3 grams of crack cocaine.

¶ 51 For this offense, the court sentenced Douglas to three years in community corrections and ordered the sentence to run concurrently with Douglas's sentence for his other 2003 drug possession conviction (Case No. 03CR2395).

¶ 52 The district court found this possession offense to be grave and serious because the "amount of cocaine shows an intention or

24

ability to sell and/or share cocaine, a dangerous drug." I see a few problems with this finding.

¶ 53    For one thing, the question for proportionality purposes is "the gravity or seriousness of the offense of conviction — not the greater offense," even though "the aggravating facts may be part of that inquiry." *People v. Wells-Yates*, 2023 COA 120, ¶ 29 (*Wells-Yates II*). So even if the facts of the case show a potential for distribution, "[t]he offense is still possession — 'among the least (and arguably the least) grave or serious of all drug offenses.'" *Id.* at ¶ 30 (quoting *Wells-Yates v. People*, 2019 CO 90M, ¶ 69 (*Wells-Yates I*)).

¶ 54    But also, do the facts show an intent to sell cocaine? Though the court found that 7.3 grams constitutes a "large amount" of cocaine, that amount is only 3.3 grams (a little more than the weight of a penny) above the cutoff for possession offenses eligible for habitual criminal sentencing. *See id.* at ¶ 38 (concluding that possession of 6.5 grams of methamphetamine is "not especially grave or serious" and noting that the defendant received a suspended sentence). Moreover, there was no other evidence in the vehicle of an intent to distribute — no large amounts of cash, no baggies, no scale. *See, e.g., People v. Munoz-Casteneda*, 2012 COA

25

109, ¶ 35 (evidence that the defendant possessed two ounces of cocaine, divided into smaller amounts and packaged in separate bags; digital scales; and "stacks of cash" established that he intended to distribute the cocaine). Even the district court hedged its bets, finding that the amount of cocaine could indicate that Douglas had the "ability" but not necessarily the "intention" to distribute, and that, in any case, "distribute" might just mean "share." And if the worst the court could say is that Douglas possessed enough cocaine for his own use (four grams, according to the legislature) plus an additional three grams to potentially share with others, that strikes me as an offense that "lies at the bottom" of the severity scale. *Wells Yates II*, ¶ 40.

## B. Accessory to a Crime Conviction

¶ 55    The accessory to a crime conviction arises from an incident in 2013 (Case No. 13CR1539). The district court found this offense to be grave and serious based on the following findings:

> The Defendant was convicted of Accessory to a crime (F3) and False Reporting-False Identification. On the night of the incident, Defendant (passenger in the car) and the co-defendant (driver), had been contacted by security in a Burger King in regard to a narcotics transaction. The driver, the co-

26

> defendant, fled the parking lot. Upon later contact by Police Officers, Defendant provided incorrect information about the driver and himself. The co-Defendant and the Defendant were involved in a hit [and] run that resulted in the death of the third-party driver. Both Defendant and the co-defendant lied to police about their identities and involvement. . . . [I]t is clear that the Defendant, providing false information, participating in a drug transaction, and failing to aid a dying individual after being the passenger in the car that hit the individual, are all actions that pose a significant danger and harm to society, such that clearly qualify as a grave and serious crime.

But the documentary evidence contradicts most of the court's findings.

¶ 56    First, to be clear, Douglas pleaded guilty to a class 5 felony. And in exchange for pleading guilty to the accessory charge, the prosecution dismissed the false reporting charge and stipulated to a sentence of probation.

¶ 57    Second, Douglas was not charged in this case as a codefendant with the driver of the vehicle. His charges involved only allegations that he gave false information to the police.

¶ 58    Third, nothing in the police report suggests that Douglas provided "incorrect information about . . . himself." To the contrary,

27

the report indicates that when police responded to the Burger King after the accident, Douglas provided his name and date of birth, both of which are denoted in the report.

¶ 59    Fourth, the evidence in the record shows that Douglas was *not in the car* at the time of the accident. The police report says that Douglas and a woman were contacted by security personnel in the Burger King parking lot. At that point, the driver "took off without" Douglas, almost immediately hit the other car (per the report, the accident occurred two blocks from the Burger King), and fled the scene of the accident, leaving her own car behind. Douglas could not have been in the car during the accident and fled with the driver because, just after the accident, a detective "responded [to the Burger King] and contacted" Douglas, and then a second detective, the report's author, contacted Douglas "on scene of the accident and conducted a follow up interview." The PSI prepared in this case confirms these facts. According to the PSI, just before the accident, the "passenger, Kiki Douglas, had been detained[,] and the driver fled the parking lot, striking a security guard and parked car as she did." The PSI recounts that a witness at the accident scene "helped the [at-fault] driver . . . out of the car and stated she

then fled the scene without providing aid or notifying [p]olice as required by law." The witness did not mention a second person in the car. Thus, the district court's finding that Douglas was "involved" in a fatal "hit and run" incident and then "lied to police" about his involvement in the collision is unsupported by the record. *Wells-Yates II,* ¶ 17 (appellate court defers to district court's factual findings concerning the facts and circumstances of the prior offenses only if they are "adequately supported by competent evidence in the record").

¶ 60     Fifth, shortly after Douglas incorrectly identified the driver — he and the second detective were still at the scene — he gave the detective the driver's real name and additional information about her, and identified her in a mug shot produced by the detective on his patrol car's computer. In all, the initial false information appears to have delayed the hit-and-run investigation by a matter of a couple of minutes. Indeed, the driver was arrested later that night.

¶ 61     Sixth, Douglas was never convicted of any drug offense in connection with the incident. *See id.* at ¶ 27 (in determining whether a predicate offense is grave and serious, the court must

focus on the offense of conviction, not "any other offense the defendant might have committed at or around the same time").

¶ 62     "In assessing the gravity or seriousness of an offense, we consider 'the harm caused or threatened to the victim or society' and 'the culpability of the offender.'" *Id.* at ¶ 33 (quoting *Wells-Yates I*, ¶ 12).  Honesty is generally the best practice, but in light of the record, it is hard to say that Douglas's offense of conviction (one lie, quickly followed by the truth) had a substantial impact on society.

### C.     Attempted Escape Conviction

¶ 63     In October 2004, Douglas pleaded guilty to attempted escape from the "Mountain Park[s] facility" (Case No. 04CR2987), in violation of section 18-8-208.1, C.R.S. 2004.  Mountain Parks was a community corrections program through which inmates remained in the custody of the Department of Corrections (DOC), under the supervision of the Denver County Jail, but would "leave the jail to go to work" and "return to the jail in the evening and on weekends." *Lawson v. Zavaras*, 966 P.2d 581, 582-83 (Colo. 1998).

¶ 64     As the majority notes, the attempted escape conviction could have qualified as a predicate offense for purposes of habitual

30

criminal sentencing in February 2017, when the court initially adjudicated Douglas a habitual criminal. But six months later, the General Assembly amended the relevant provision, section 18-1.3-801(5), C.R.S. 2017; *see* Ch. 374, sec. 1, § 18-1.3-801(5), 2017 Colo. Sess. Laws 1937. Thus, by the time of Douglas's first appeal and the remand proceedings, the conviction could no longer serve as a predicate offense. The district court, though, failed to consider the amendment in determining whether attempted escape from a community corrections facility is a grave and serious offense. *See Wells-Yates I*, ¶ 52.

¶ 65 The Attorney General contends that, regardless, the prior offense is grave and serious because attempted escape is "dangerous to the personnel at the facility and to the community." But in determining gravity and seriousness of an offense, the court does not consider the crime generally; rather, the determination "entail[s] an analysis of . . . the facts and circumstances surrounding" each predicate offense as committed by the defendant. *Id.* at ¶ 75. There is no evidence that Douglas's attempted escape from the community corrections facility placed any jail personnel or member of the public in harm's way. Indeed,

for all we know, Douglas went to work and simply failed to return to the facility. As well, the offense of conviction was a lesser included offense, not "the greater-inclusive offense," and involved "an attempt to commit an act," not a completed act. *Id.* at ¶ 12 (citing *Solem v. Helm*, 463 U.S. 277, 293 (1983)). Accordingly, I agree with the majority that this crime is not grave and serious.

## II. Habitual Criminal Sentencing Does Not Apply Here

¶ 66 But all that being said, I cannot agree with the majority's disposition. A remand for an extended proportionality review is insufficient because it presupposes that habitual criminal sentencing applies here, when it does not. And by perpetuating the prior division's error, the majority leaves open the possibility that Douglas's unlawful life sentence could be reimposed — an egregious and unacceptable result.

### A. 2017 Amendments to Habitual Criminal Sentencing Statute

¶ 67 First, an explanation as to why the prior attempted escape conviction does not qualify as a predicate offense.

¶ 68 In February 2017, when the district court adjudicated Douglas a habitual criminal, the habitual criminal sentencing statute provided that a conviction for attempted escape "shall not be used

32

for the purpose of adjudicating a person an habitual criminal . . . unless the conviction is based on the offender's . . . attempt to escape from a correctional facility, as defined in section 17-1-102, C.R.S., or from physical custody within a county jail." § 18-1.3-801(5), C.R.S. 2016. A "correctional facility" is "any facility under the supervision of the [DOC] in which persons are or may be lawfully held in custody as a result of conviction of a crime." § 17-1-102(1.7), C.R.S. 2016. Because inmates at the Mountain Parks facility remained in the custody of the DOC, the earlier version of the statute did not expressly preclude the use of Douglas's prior attempted escape conviction as a predicate offense for habitual criminal sentencing purposes.

¶ 69 But, as noted, in August 2017, the legislature amended section 18-1.3-801(5). The amendatory language clarified that "for purposes of [subsection (5)], 'correctional facility' does not include a community corrections facility . . . or a halfway house." 2017 Colo. Sess. Laws at 1937. In my view, the amendment is intended to preclude use of a prior conviction for attempted escape from any community corrections facility, whether it is operated by a unit of local government, like Mountain Parks, or by a private corporation.

33

*See* § 17-27-102(2.5), (3), C.R.S. 2025 (a "community corrections facility" is a "facility used by a community corrections program," and a "community corrections program" means any "community-based or community-oriented program" that is "operated by a unit of local government, the [DOC], or any private individual, partnership, corporation, or association."). The Attorney General does not argue otherwise.

¶ 70 Instead, the Attorney General says that the amended statute does not apply to Douglas because he committed the triggering offenses in 2015, when the prior version of the habitual criminal sentencing statute was in effect. I disagree.

¶ 71 In 2018, while Douglas's first appeal was pending — and before the prior division issued its opinion — the Colorado Supreme Court announced its decision in *People v. Stellabotte*. The defendant in that case was charged with theft, then a class 4 felony. *Stellabotte*, ¶ 6. Before trial, the legislature amended the theft statute, rendering the defendant's alleged criminal act a class 5 felony. The amendment was silent regarding whether it applied prospectively or retroactively. *Id.* The defendant was convicted of theft and sentenced under the prior version of the statute. *Id.* On

appeal, he argued that he should have received the benefit of the amendment's reclassification. *Id.* at ¶ 7. The supreme court agreed. Reaffirming its holdings in *People v. Thomas*, 525 P.2d 1136, 1138 (Colo. 1974), and *People v. Thornton*, 529 P.2d 628, 628 (Colo. 1974), the court ruled that "ameliorative, amendatory legislation applies retroactively to non-final convictions under section 18-1-410(1)(f), [C.R.S. 2025,] unless the amendment contains language indicating it applies only prospectively." *Stellabotte*, ¶ 3.

¶ 72 The August 2017 amendment to section 18-1.3-801(5) is silent regarding whether it applies prospectively or retroactively. Thus, under *Stellabotte*, Douglas is entitled to the benefit of the amendatory legislation, as his judgment of conviction is not yet final. *See Stellabotte*, ¶ 26 ("*Thomas* and *Thornton* provide a rule that gives convicted criminal defendants the benefit of amendatory legislation that became effective at any time before the conviction became final on direct appeal under section 18-1-410(1)(f).").

¶ 73 It makes no difference that Douglas did not seek relief specifically pursuant to section 18-1-410(1)(f). In *Thornton*, the defendant sought the benefit of amendatory legislation on direct

appeal rather than through a postconviction motion.  The supreme

court concluded that although "the procedure followed in *People v.*

*Thomas* . . . was by way of post-conviction relief[,] . . . there is no

valid reason not to grant similar relief under the *Thomas* rule,

where, as here, the application for relief is sought by direct appeal."

*Thornton*, 529 P.2d at 628; *see also Stellabotte*, ¶ 17 ("[I]n *People v.*

*Thornton* we extended the *Thomas* rule to apply to defendants

seeking the benefit of ameliorative changes in sentencing laws on

direct appeal.").

¶ 74    Accordingly, in 2019, when the *Douglas I* division considered

Douglas's first appeal, Douglas was entitled to the benefit of the

amendatory language in section 18-1.3-801(5).

B.    The Validity of Douglas's Habitual Criminal Adjudication

¶ 75    In his December 2018 opening brief, filed in the first appeal,

Douglas argued that "under the *most recent version* of the habitual

[criminal] statute" (emphasis added), his prior conviction for

attempted escape "in [Case No.] 04CR2987" did not qualify under

section 18-1.3-801(5) as a predicate offense for purposes of

adjudicating him a habitual offender.  Douglas's lawyer did not

36

mention that the Case No. 04CR2987 conviction concerned an attempted escape from a community corrections facility.

¶ 76    Nonetheless, the prior division knew that Douglas's conviction was based on an attempted escape from "the Mountain Parks facility." *Doulgas I*, slip op. at ¶ 45. And it understood that Douglas was challenging the use of that conviction as a qualifying predicate under the then-current (2019) version of section 18-1.3-801(5). *Id.* at ¶ 41. But when the division discussed section 18-1.3-801(5) for purposes of its analysis, it disregarded the relevant amendatory language concerning the exemption of community correction facilities from the definition of "correctional facility." *Id.* at ¶ 44. As a result, the division simply adopted the argument advanced by the prosecutor at the February 2017 adjudication hearing, when the prior version of the statute was in effect, that "Mountain Parks was a correctional facility under the control of the Department of Corrections." *Id.* at ¶ 45. By 2019, though, that was wrong.

¶ 77    As the majority notes, throughout the appellate proceedings, Douglas has continued to challenge the use of his prior attempted escape conviction as a predicate offense. Given the procedural

history, I disagree with the Attorney General that Douglas "has never suggested" that the amended statute applies. He has consistently argued, albeit cursorily, that the more recent version of the statute precluded the court from using the conviction to adjudicate him a habitual criminal. The prior division analyzed the issue and, in my view, arrived at the wrong conclusion.

¶ 78 But, in any event, the majority gives a different reason for declining to review the validity of Douglas's habitual criminal adjudication. It says that the law of the case doctrine binds us to the prior division's ruling "unless we can say that application of that prior ruling would result in error." *Supra* ¶ 25. The problem, according to the majority, is that Douglas did not "address the law of the case doctrine or sufficiently demonstrate why *Douglas I*'s ruling was error." *Supra* ¶ 25.

¶ 79 When an appellate court rules on an issue in a case, that ruling becomes the law of the case. *People v. Roybal*, 672 P.2d 1003, 1005 (Colo. 1983). The law of the case doctrine generally requires a court to follow its prior relevant rulings in the case. *See Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2021 COA 114, ¶ 23. However, the doctrine is "merely discretionary when applied

to a court's power to reconsider its own prior rulings." *Giampapa v. Am. Fam. Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo. 2003). "Thus, a division of this court may review another division's ruling in the same case where 'the previous decision is no longer sound because of changed conditions or law, or legal or factual error, or if the prior decision would result in manifest injustice.'" *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 10 (citation omitted). "[T]he law of the case doctrine neither requires nor encourages courts to support erroneous judgments." *Giampapa*, 64 P.3d at 243.

¶ 80    In our request for supplemental briefing, we asked the parties whether this division had "authority to revisit *Douglas I*'s conclusion regarding the habitual adjudication." True enough, in his supplemental brief, Douglas did not refer to the law of the case doctrine. Instead, he cited the broader (more favorable) rule that one division of this court is not bound by the decisions of other divisions. *See, e.g.*, *Chavez v. Chavez*, 2020 COA 70, ¶ 13. I do not understand, and the majority does not explain, why Douglas's failure to address the doctrine of law of the case as an obstacle to our review somehow ties our hands. The doctrine exists, whether

39

Douglas acknowledges it or not, but it does not prevent us from revisiting the prior division's habitual criminal adjudication ruling if we are convinced that the ruling rests on a legal error.

¶ 81    Nor am I persuaded that Douglas failed to show that there was an error. The bar was not high in this respect — all Douglas had to do was argue that his prior conviction involved an attempted escape from a community corrections facility and that, under the current version of the statute, that conviction does not qualify as a predicate offense for habitual criminal sentencing purposes. He did that much. His argument would have been more fulsome if he had cited *Stellabotte*, but to be fair, that case did not come up in the Attorney General's brief either. Passable but weak briefing is not a reason to "support [an] erroneous judgment[]," *Giampapa*, 64 P.3d at 243, particularly where the erroneous judgment might consign a person to die in prison when he should not have to.[2]

---

[2] If we are letting the erroneous judgment stand because of the lawyer's deficient performance — either in the first appeal or this appeal — we are just postponing the inevitable: a meritorious postconviction motion based on ineffective assistance of counsel. One way or the other, a division of this court will have to determine if Douglas is a habitual criminal. I see no good reason to delay that determination.

¶ 82    The majority's other reason for sidestepping the adjudication issue is that it was not before the district court on remand.  True, but that just highlights the problem.  Under the mandate rule, the district court had to follow the prior division's ruling — right or wrong.  *Owners Ins. Co.*, ¶ 24.  It seems odd to say that because the error could not be corrected earlier, it should not be corrected now.

¶ 83    For these reasons, I can only concur in the judgment reversing the district court's order; I cannot concur in the majority's decision to remand for further proportionality proceedings under the habitual criminal sentencing statute.